UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Schalls Holding ApS
c/o Bygn. 273, Lufthavnen 2
2791 Dragør, Denmark

and

Alessandro Agrimi
Via Giambattista Gelli 42
Rome, Italy,

        Plaintiffs,

  v.

F&E Aviation Holdings, Inc.
657 South Drive Suite 306
Miami Springs, FL 33166

        Defendant.

*Case* No.

# COMPLAINT

Plaintiffs Schalls Holding ApS ("Schalls") and Alessandro Agrimi ("Agrimi" and together with Schalls "Plaintiffs"), by and through undersigned counsel, hereby file this Complaint against Defendant F&E Aviation Holdings, Inc. ("F&E" or "Defendant") in order to prevent (a) a fraudulent transfer of the shares and/or sale of Northern Aerotech ApS ("NAT") and (b) the improper removal of NAT's officers by Defendant. In support thereof, Schalls alleges as follows:

## PRELIMINARY STATEMENT

1. Pursuant to a Share Purchase Agreement ("SPA") entered into in March 2022, Plaintiffs sold their shares in NAT to Defendant in exchange for, among other things, four future Earn Out payments, which are calculated based on the future Earnings Before Interest Tax Depreciation and Amortization ("EBITDA") of NAT. Two of the Earn Out payments have become

due, but only one has been paid. The second Earn Out payment of more than USD $ 1.3 million is past due by more than 100 days. Two further Earn Out Payments are due over the course of the next two years. Under the SPA, the shareholders of Schalls Holding, Morten Schalls Jørgensen and Dan Lund, and Alessandro Agrimi, continued to serve as officers of NAT in order to maximize performance of NAT with the incentive of increasing the Earn Out payments due to Schalls and Mr. Agrimi.

2. Section 4.3, the SPA requires that Defendant not "take any actions with the purpose of having a material negative impact on the Earn Out." Defendant is currently negotiating the sale (or transfer of shares) of NAT to a third-party direct competitor, Nayak Aircraft Services ("Nayak"), with the sale to be closed on or before Tuesday July 1, 2025. The sale of NAT will have a material negative impact on the future Earn Out by (a) reducing the value in an unknown amount due to the lack of management by the Plaintiffs and corresponding negative effect Nayak's ownership will have on NAT's performance, and (b) making the calculation and collection of future Earn Out payments impossible because neither Plaintiffs nor Defendant will have access to books and records after sale or the transfer of NAT shares.

3. Pursuant to the SPA's arbitration clause, on Monday June 23, 2025, Plaintiffs initiated an arbitration proceeding before the Danish Institute of Arbitration ("DIA"), which is the venue for dispute resolution set forth in the Section 15.2 of the SPA.[1] The arbitration proceeding seeks, among other things, (a) damages for the USD $1.3 million owed for the second Earn Out payment, (b) a declaration that the transfer of Defendant's NAT shares to a third-party competitor

---

[1] The Statement of Claim filed with the Danish Institute of Arbitration is attached as Exhibit 1 to the Declaration of Kim Rasmussen, counsel for Schalls and Mr. Agrimi in the arbitration proceeding. Mr. Rasmussen's Declaration is attached as **Exhibit C** to the contemporaneously filed Motion for Temporary Restraining Order/Preliminary Injunction and Incorporated Memorandum of Law.

violates Section 4.3 of the SPA and (c) a declaration that termination of the employment of Morten Schalls Jørgensen, Dan Lund and/or Alessandro Agrimi would constitute a material breach of the SPA.

4. Importantly, as set forth in the Declaration of Kim Rasmussen, counsel for Plaintiffs in the arbitration proceeding, the DIA does not have the power to enjoin the sale or transfer of shares of NAT by Defendant.

5. Plaintiffs thus bring this action under Fla. Stat. § 726.105, the Florida Fraudulent Transfer Act, and for an equitable injunction, to prevent the fraudulent transfer of NAT shares to the third-party competitor, and to prevent Defendant from removing the current officers of NAT, in order to preserve the status quo pending the outcome of the proceeding in the Danish Institute of Arbitration and avoid the irreparable harm to Plaintiffs that the transfer and removal of officers will cause.

6. In this Complaint, Plaintiffs have set forth a detailed history of the conduct of Defendant after the SPA was concluded in order to (a) demonstrate Defendant's intent to defraud Plaintiffs and/or (b) demonstrate that multiple "badges of fraud" exist from which the fraudulent intent of Defendant may be inferred under the applicable case law.

## PARTIES

7. Plaintiff Schalls is a company incorporated under the laws of Denmark with an address c/o Bygn. 273, Lufthavnen 2, 2791 Dragør, Denmark.

8. Plaintiff Alessandro Agrimi is an Italian citizen who resides at Via Giambattista Gelli 42, Rome, Italy.

9. Defendant F&E Aviation Holdings, Inc. is a Florida corporation located at 657 South Drive Suite 306, Miami Springs, FL 33166.

**JURISDICTION AND VENUE**

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because: (i) there is diversity of citizenship between Plaintiffs and Defendant; and (ii) the amount in controversy exceeds $75,000.

11. This Court has personal jurisdiction over Defendant and venue is properly laid because Defendant is incorporated in the state of Florida and does business in Miami-Dade County.

**FACTUAL ALLEGATIONS**

1. On or about March 11, 2022, Plaintiffs entered into the SPA with Defendant whereby Plaintiffs sold their shares of NAT – a 100% interest - to Defendant.[2]

2. In exchange for the NAT shares, Defendant paid to Plaintiffs the Purchase Price which consisted of both the Closing Installment of USD $820,000 and the Earn Out.

3. For the Earn Out, in each of Fiscal Year ("FY") 23, FY 24, FY 25, and FY 26, Plaintiffs are entitled to receive as part of the Purchase Price 6 * 20% (120%) of NAT's EBITDA in the relevant fiscal year.

4. The SPA was amended on September 12, 2022, solely to change the dates of the fiscal years for NAT going forward and thereby change the dates on which the Earn Out payments under the SPA are due. The Appendix to the SPA requires Defendant to deliver the calculation of the Earn Out payments to the Plaintiffs no later than the last day in February in the calendar year following the end of each FY.[3]

---

[2] The SPA is attached as **Exhibit A** to the contemporaneously filed Motion for a Temporary Restraining Order and Preliminary Injunction.
[3] For example, the FY 23 Earn Out calculation was due February 29, 2024, the FY 24 Earn Out calculation was due February 28, 2025, and so forth.

5. The SPA also provided that following the delivery of an Earn Out calculation, the Plaintiffs "shall have reasonable access to the books and records of the [Defendant] relating to [NAT] during normal working hours, and any other documents and information systems, always provided that such access is relevant for the calculation of the respective Earn Out payment and is supervised by the [Defendant]."

6. Given that the majority of Plaintiffs' compensation under the SPA would come in the form of the Earn Outs, Section 4.3 provides that F&E will not "take any actions with the purpose of having a material negative impact on the Earn Out."

7. When the parties concluded the SPA, Schalls' primary shareholders, Morten Schalls Jørgensen and Dan Lund, as well as Mr. Agrimi, served as officers at NAT. Mr. Jørgensen as CEO, Mr. Lund as CFO, and Mr. Agrimi as CCO.

8. The parties agreed in the SPA that Mr. Jørgensen, Mr. Lund, or Mr. Agrimi would continue serving in those roles after Plaintiffs had sold the shares to Defendant.[4]

9. In their positions, Plaintiffs have the responsibility and opportunity to maximize NAT EBITDA, which would increase the value they would receive as Earn Out payments.[5]

10. To be sure, each of their respective contracts provides language that as "part of the [sale of NAT per the SPA], it has been agreed that the Employee will continue as [CCO/CEO/CFO] of [NAT]."

11. The SPA provides at section 4.6 that if Mr. Jørgensen, Mr. Lund, or Mr. Agrimi elected to leave the company or breach their employment contract in any year in which Plaintiffs

---

[4] The Employment Contracts of Mr. Jørgensen, Mr. Lund, and Mr. Agrimi are attached as **Exhibits D, E, F** to the contemporaneously filed Motion for a Temporary Restraining Order and Preliminary Injunction.

[5] The Declaration of Morten Schalls Jørgensen is attached as **Exhibit B** to the contemporaneously filed Motion for a Temporary Restraining Order and Preliminary Injunction.

are entitled to an Earn Out payment, they would lose their right to receive the applicable portion of the Earn Out payment.

12. The SPA also included a noncompete clause for Plaintiffs preventing them from competing with NAT in the three years after closing.

13. The essence of the SPA is that Plaintiffs transferred 100% of NAT shares to Defendant while Schalls' shareholders, Mr. Jørgensen and Mr. Lund, and Mr. Agrimi (the former 10% owner of NAT), who all three founded and built NAT, would continue to work at NAT growing the business to benefit Defendant and increasing the revenue to maximize the Earn Out payments.

14. When the first Earn Out payment calculation came due on February 29, 2024, however, Defendant did not provide the calculation. NAT's EBITDA for FY 23 was $439,908.48 which, by the terms of the SPA, yielded an Earn Out payment of $527,890.17. Defendant ultimately delayed payment of the Earn Out by approximately 75 days, a breach of the payment schedule under the SPA.

15. During FY 24, Mr. Jørgensen, Mr. Lund, and Mr. Agrimi continued growing NAT. NAT's EBITDA for FY 24 was $1,103,798.33, a 150.91% increase over FY 23 which yielded an Earn Out payment obligation for Defendant of $1,324,558 due February 28, 2025.

16. Defendant failed to timely deliver a calculation of the Earn Out and or make the Earn Out payment when due in March 2025. The payment has not been made to date.

17. Plaintiffs sought to negotiate with Marcelo Paris, who is the Treasurer of Defendant, beginning in March 2025. Mr. Paris stated that Defendant required an additional 60 days to formulate a payment proposal, citing the need to "work with banks" to seek external capital and investor partners.

18. Given the EBITDA for NAT of over $1.1 million in FY 2024, upon information and belief Plaintiffs assert that Defendant has used the funds intended for the payment of the Earn Out to provide for other entities capital needs.

19. On May 7, 2025, after more than 60 days in breach, Defendant convened a meeting with Plaintiffs. At that meeting, Mr. Paris relayed a statement from Fred Murphy, F&E's controlling owner, saying, "I'll pay them, but on my terms. If they don't want to accept it, that's fine. They'll be in court for five years." Mr. Paris added, "[w]e don't dispute the amount. So, we will pay you, but in eight monthly installments."

20. Mr. Paris further disclosed at this meeting, for the first time, that Defendant was in negotiations with Nayak, NAT's largest direct competitor in Europe, to sell NAT to Nayak. Mr. Paris stated that the targeted closing date of the sale was June 30, 2025.

21. In a subsequent meeting between Defendant and Schalls on May 14, 2025, Mr. Paris stated that F&E was in financial distress. "We are struggling on a weekly basis to make payroll. I don't have $1.1 million to give you today," he said. Cam Murphy, an F&E shareholder added that "we don't have the cash to just wire the money. We can't take that kind of hit to the cash flow." Defendant instead again pressured Plaintiffs to accept the Earn Out in eight monthly installments and to work with Defendant and Nayak to consummate the sale of NAT.

22. Defendant has further failed to make critical financial investments to NAT. This failure has exposed NAT to operational inefficiencies, increased costs, and reduced opportunities to increase revenue. Defendant's representatives have admitted to failing to provide post-closing investment and operational backing to NAT.

23. At the same time, Defendant has made significant capital injections into its subsidiaries FEAM Aero and BOS Aerospace both of which operate in the same market as NAT.

Upon information and belief, NAT is the only subsidiary for which Defendant has an obligation to make further Earn Out payments.

24. On May 22, 2025, Defendant convened a meeting between NAT and Nayak to discuss the due diligence for the transaction. Mr. Jørgensen and Mr. Lund attended the meeting on behalf of NAT. Nayak's CEO Marco Smit stated at the meeting that the targeted closing date for the transaction is no later than July 1, 2025.

25. As part of the due diligence process, F&E disclosed confidential operational and commercial information about NAT to Nayak. Those disclosures jeopardize NAT's ability to continue as an independent business. The closing of the sale will fully allow Nayak to access detailed financial information, including all cost centers, contracts for top five customers, a complete customer list (with locations, service level, payment terms and contractual highlights), NAT's internal procedure and authorizations, NAT's compliance monitoring system, all NAT staff financial information (contracts and contact details), and all legal, authority and insurance details. Nayak's possession of this information will severely harm NAT's ability to expand and increase its revenue which will in turn reduce the value of the FY 25 and FY 26 Earn Out payments.

26. To date, Defendant has failed to communicate to Plaintiffs the proposed transaction's structure, post-closing operational plans, or any continuity strategy regarding NAT's management or oversight.

27. Critically, there has been no disclosure from Defendant as to how the SPA—still active and binding—will be preserved or enforced post-sale. Under the SPA, Plaintiffs have a contractual right to view the books of F&E to verify Defendant's calculation of the Earn Out. Plaintiffs have no right to require Nayak to allow it access to NAT's books and records after the transfer of the shares.

28.     In summary, Defendant has breached the SPA by failing to tender payment of the FY 24 Earn Out and now seeking to fraudulently transfer the shares of NAT to a third-party competitor "with the purpose of having a material negative impact on the Earn Out" payment by destroying the future revenue of NAT and placing the books and records beyond the control of Plaintiffs and Defendant. The pending sale of NAT to Nayak will decimate NAT's ability to compete for current and new business and will irreparably harm Plaintiff.

29.     Section 15.2 of the SPA states that any dispute under the SPA must be resolved in front of the Danish Institute of Arbitration.

30.     Pursuant to the SPA's arbitration clause, Schalls initiated an arbitration proceeding (the "Arbitration") in Denmark on Monday, June 23, 2025.

31.     In the DIA action, Plaintiffs seek, among other things, (a) damages for the USD $1.3 million owed for the second Earn Out payment, (b) a declaration that the transfer of Defendant's NAT shares to a third-party competitor violates Section 4.3 of the SPA and (c) a declaration that termination of the employment of Morten Schalls Jørgensen, Dan Lund and/or Alessandro Agrimi would constitute a material breach of the SPA.

32.     The Danish Institute of Arbitration does not have the power to enjoin a sale of NAT by Defendant.

33.     Plaintiffs will suffer irreparable harm if this Court does not enjoin Defendant's transfer of the shares during the pendency of the DIA action.

34.     Such an injunction will preserve the status quo and prevent Defendant from allowing a direct competitor to take over NAT's business operations and divert potential revenue that could and should be used to fund the Earn Out payments.

35. Moreover, Plaintiffs will lose all access to the books and records of NAT for the calculation of the Earn Out Payments and, upon information and belief, Mr. Jørgensen, Mr. Lund, and Mr. Agrimi will be terminated from their positions of employment with NAT and lose the ability granted by the SPA to operate NAT to maximize their Earn Out payments.

36. To preserve the status quo in support of this arbitration proceeding, Schalls hereby seeks to enjoin the sale or transfer of shares of NAT and enjoin the removal of Mr. Jørgensen, Mr. Lund, and Mr. Agrimi from their positions as officers of NAT.

## COUNT I

### Fraudulent Transfer under Fla. Stat. § 726.105

37. Plaintiffs repeat and reallege each and every allegation above as if set forth fully in this cause of action.

38. Under the Florida Fraudulent Transfer Act, Fla. Stat. § 726.105, a fraudulent transfer occurs when a debtor transfers legal title of property to a third party with the intent to hinder, delay, or defraud a present or future creditor.

39. Plaintiffs have a right to payment from F&E under the SPA. Accordingly, Plaintiffs are creditors and F&E is a debtor.

40. F&E seeks to transfer NAT with actual intent to hinder, delay, or defraud Plaintiffs.

41. F&E is generally not paying its debts when they come due and is therefore presumed to be insolvent. *See* Fla. Stat. § 726.105(2)(i); Fla. Stat. § 726.103(2).

42. The transfer will occur after F&E has been sued or threatened with suit. *See* Fla. Stat. § 726.105(2)(d).

43. The transfer will occur shortly before or after a substantial debt was incurred. *See* Fla. Stat. § 726.105(2)(j). F&E has incurred a substantial debt before the transfer occurs because

it still owes Plaintiffs the FY 24 Earn Out payment. F&E will incur substantial debt in the near future as the FY 25 and FY 26 Earn Out payments become due.

44. F&E has violated the SPA by failing to tender payment of the FY 24 Earn Out payment.

45. F&E will violate the SPA section 4.3 by transferring NAT shares. The transfer of NAT shares will prevent Plaintiffs from obtaining financial information on NAT's EBITDA which jeopardizes their ability to independently verify the calculations of the FY 25 and FY 26 Earn Out payments. Any transfer of NAT will also prevent F&E from obtaining financial information on NAT's EBITDA which jeopardizes its ability to calculate the Earn Out payments in the first place.

46. F&E will violate the SPA section 4.3 by transferring NAT *to a direct competitor* of NAT. The transfer will give Nayak detailed financial information, client lists and contracts, internal procedures, NAT's compliance monitoring system, and staff financial information, contracts, and contact details which will harm NAT's ability to compete for existing and new revenue streams. It will simultaneously benefit Nayak, NAT's largest European competitor, and in turn reduce the value of the Earn Out payments.

47. F&E has made capital contributions to FEAM and BOS Aerospace, but not to NAT. Upon information and belief, F&E does not have further Earn Out obligations to those other subsidiaries.

48. Fred Murphy, F&E's controlling owner, told Plaintiffs "I'll pay [you], but on my terms. If [you] don't want to accept it, that's fine. [You'll] be in court for five years."

49. The pending transfer of NAT threatens irreparable harm to Plaintiffs.

50. The remedies available at law are inadequate to compensate for the injury.

51. An equitable remedy is warranted given the balance of hardships between the plaintiffs and defendant.

52. The injunction sought would not hurt public interest.

## COUNT II

### Equitable Injunction to Prevent the Fraudulent Transfer and the Removal of Mr. Jørgensen, Mr. Lund, and Mr. Agrimi from their positions as officers of NAT.

53. Plaintiffs repeat and reallege each and every allegation above as if set forth fully in this cause of action.

54. For all the facts and reasons set forth in the prior allegations, this Court should exercise its equitable powers, apart from the Florida Fraudulent Transfer Act, to prevent the fraudulent transfer of NAT to a third party because such transfer will irreparably harm Plaintiffs.

55. In addition, this Court should, in addition to preventing the transfer, exercise its equitable powers to prevent the removal of Morten Schalls Jørgensen, Dan Lund, and Mr. Agrimi as officers of NAT during the Earn Out period.

56. In their positions, and as agreed in the SPA, Plaintiffs have the responsibility and opportunity to maximize NAT EBITDA, which would increase the value they would receive as Earn Out payments.

57. Upon information and belief, Defendant will retaliate against Plaintiffs for filing the DIA action and this action by removing Mr. Jørgensen, Mr. Lund, and Mr. Agrimi from their positions as officers of NAT.

58. Plaintiffs will suffer irreparable harm if Mr. Jørgensen, Mr. Lund, and Mr. Agrimi do not continue in their roles as officers of NAT and such removal would have a material negative effect on the Earn Out. Plaintiffs will be unable to operate NAT and maximize its revenue as

envisioned in the SPA. The negative effect on the Earn Out cannot be calculated and Plaintiffs will be unable to make up the lost time and revenue before the Earn Out period closes.

59. The remedies available at law are inadequate to compensate for the injury.

60. An equitable remedy is warranted given the balance of hardships between the plaintiffs and defendant.

61. The injunction sought would not hurt public interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment as follows:

A. A temporary restraining order and preliminary injunction enjoining F&E Aviation from selling NAT pending the results of the Arbitration;

B. A temporary restraining order and preliminary injunction enjoining F&E Aviation from terminating the employment of Morten Schalls Jørgensen, Dan Lund, and Alessandro Agrimi pending the results of the Arbitration;

C. A permanent injunction enjoining F&E Aviation from selling NAT pending the results of the Arbitration;

D. A permanent injunction enjoining F&E Aviation from terminating the employment of Morten Schalls Jørgensen, Dan Lund, and Alessandro Agrimi pending the results of the Arbitration;

E. Such other and further relief as the Court may deem just and proper.

Dated June 23, 2025                                   Respectfully Submitted,

By: */s/ Benjamin S. Boyd*
Benjamin S. Boyd, Esq.
Florida Bar No. 0050401

**DLA PIPER LLP (US)**
500 Eighth Street, NW
Washington, D.C. 20004
Telephone: 202-799-4502
Facsimile: 202-799-5502
Email: Benjamin.boyd@dlapiper.com
Email: Jessica.green-johnson@dlapiper.com

Vanessa Offutt, Esq.
Florida Bar No. 1002624
**DLA PIPER LLP (US)**
200 South Biscayne Blvd., Suite 2500
Miami, FL 33131
Telephone: 310-595-3149
Facsimile: 310-595-3409
Email: vanessa.offutt@us.dlapiper.com
Email: Chris.Baker2@us.dlapiper.com

*Attorneys for Plaintiffs Schalls Holding ApS and Alessandro Agrimi*